UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION


RONALD D. BOWEN                    )
                                   )
v.                                 )          No. 3:10-0048
                                   )          JUDGE CAMPBELL
UNITED STATES OF AMERICA           )

MEMORANDUM

I. <u>Introduction</u>

Pending before the Court is a Motion Under 28 U.S.C. § 2255 To Vacate, Set Aside, or

Correct Sentence By A Person In Federal Custody (Docket No. 1), filed by the

Movant/Petitioner (hereinafter "Petitioner"), to which the Government has filed a Response.

(Docket No. 10). The Court held an evidentiary hearing in this case on April 21, 2010. (Docket

Nos. 16, 17, 18). Both parties have filed post-hearing briefs (Docket Nos. 21, 22).

Based on the evidence adduced at that hearing, the pleadings and briefs filed by both

parties, the record of Petitioner's underlying conviction, and the entire record in this case, the

Court concludes that Petitioner's Motion should be GRANTED for the reasons set forth below.

Specifically, the Court concludes that Petitioner received the ineffective assistance of counsel for

failure of counsel to convey and explain the terms of the Government's plea offer to him.

On or before July 21, 2010, the parties shall file briefs addressing the appropriate remedy

for the constitutional deprivation found by the Court herein.

II. <u>Procedural and Factual Background</u>

The record in the underlying criminal case indicates that the Petitioner was charged with

participating in a conspiracy to commit the crime of structuring transactions to avoid reporting

requirements, in violation of 18 U.S.C. § 371. (Docket No. 1 in Case No. 3:06-00109). The

charge arose out of the disposition of proceeds from certain unregulated sales of tobacco in Tennessee, North Carolina, and other states. (Id.)  Named as co-defendants were Robert D. Oldham, Christopher L. Sutton, Joey Bowen, Bobby C. Cates, Garth E. Middaugh, Clarence W. Shirk, William A. Shotwell, Kenneth A. Swayne, Rennie Turner, and Sam A. Turner. (Id.)

On April 3, 2006, prior to the filing of the Indictment, Joseph Baugh was appointed to represent the Petitioner when he received a "target letter" from the Government. (Evidentiary Hearing Transcript, at 109-110 (Docket No. 18)).  The Indictment was issued on June 21, 2006; the Petitioner was arrested on July 6, 2006; and the Petitioner was arraigned on August 16, 2006. (Docket Nos. 1, 79, 80 in Case No. 3:06-00109).  Several months later, Petitioner sent a letter to the Court, dated December 27, 2006, requesting new counsel. (Docket Nos. 195, 196 in Case No. 3:06-00109).  After holding a hearing on the Petitioner's request, on January 8, 2007, the Court ordered new counsel be appointed to represent him. (Docket Nos. 206, 207 in Case No. 3:06-00109).  A week later, Joseph Edwards entered a Notice of Appearance as new counsel for the Petitioner. (Docket No. 221).

After a seven-day trial, the jury found the Petitioner guilty of the charge. (Docket Nos. 395, 400 in Case No. 3:06-00109).  At the sentencing hearing, the Court determined that Petitioner's sentencing guideline range was 97 to 121 months, but that the statutory maximum sentence was 60 months. (Sentencing Hearing Transcript, at 121 (Docket No. 539 in Case No. 3:06-00109)).  The Court granted the Petitioner a reduction of nine months based on his pretrial cooperation and assistance to the Government, and sentenced him to a term of 51 months of imprisonment. (Docket No. 530 in Case No. 3:06-00109).

At the evidentiary hearing on the claims presented in Petitioner's Motion To Vacate, the

Petitioner called Corey Duber and Joey Bowen to testify, and he testified on his own behalf. Mr. Duber testified that he is a friend of the Petitioner's nephew, Joey Bowen. (Evidentiary Hearing Transcript, at 10-11 (Docket No. 18)). Mr. Duber described his career in law enforcement, first as a police officer in Dallas, Texas, then as an agent for the North Carolina Bureau of Investigation working with a Drug Enforcement Administration Drug Task Force. (Id., at 8-9). Because of physical injuries incurred while on duty, Mr. Duber retired from law enforcement and worked with the Raleigh, North Carolina school district, and later, the North Carolina Crime Commission. (Id., at 9-10).

Mr. Duber testified that he then moved to Greenville, North Carolina in 2004, and met Joey Bowen, who worked as a realtor there. (Id., at 10). Mr. Duber explained that he met the Petitioner when Joey Bowen was indicted as one of the co-defendants in the underlying criminal case. (Id., at 10-11). At that time, Mr. Duber was assisting Joey Bowen with his defense preparation. (Id., at 11). According to Mr. Duber, he and Joey Bowen occasionally had lunch with the Petitioner, who sought Mr. Duber's assistance with his representation. (Id.). Mr. Duber testified that he was initially resistant to assisting the Petitioner because of the Petitioner's prior drug conviction. (Id.).

Mr. Duber testified that the Petitioner later contacted him when he received a proposed plea agreement from the Government, and that he was very upset that the facts set forth in the plea agreement were wrong. (Id., at 11-12). Mr. Duber testified that the Petitioner showed him the factual basis section of the plea agreement, and that the Petitioner had crossed out a lot of the language there. (Id.). The Petitioner told Mr. Duber that his attorney told him to make the edits and send it back. (Id.). Mr. Duber testified that he advised the Petitioner that it was the right

thing to do. (Id.). According to Mr. Duber, his concern with the factual basis section was that the Government wanted the Petitioner to admit he engaged in wrongdoing with Joey Bowen, and Mr. Duber believed Joey Bowen to be innocent. (Id., at 12). Mr. Duber was also concerned that if the Petitioner signed the plea agreement as proposed, and later could not supply facts to support the assertions in the factual basis section, the Government could then void the agreement. (Id., at 13). Mr. Duber testified that he advised the Petitioner not to sign the proposed plea agreement with Joey Bowen's name as a coconspirator, and that the Petitioner should talk with his attorney. (Id., at 13-14). Mr. Duber reiterated, however, that the Petitioner had already "marked-up" the agreement before he showed it to Mr. Duber. (Id., at 14). According to Mr. Duber, the Petitioner never denied his own guilt. (Id.).

Mr. Duber testified that the Petitioner never told him about receiving any "revised plea agreement" incorporating the changes the Petitioner had made on the first draft. (Id., at 17).

At a later time, Mr. Duber testified, the Petitioner asked to have lunch with him and Joey Bowen. (Id., at 14-15). According to Mr. Duber, the Petitioner had met with the Government and was very disturbed about the meeting. (Id.). Mr. Duber testified that he advised the Petitioner to write a letter to the Judge requesting a new attorney. (Id., at 15). Mr. Duber explained that the Petitioner later produced the original draft of that letter, which was very detailed and directly accused the Government of prosecutorial misconduct. (Id.). Mr. Duber testified that he told the Petitioner it would be a mistake to include that accusation in the letter, and advised the Petitioner to focus on requesting new counsel, and let the new counsel handle his problems with the prosecutors. (Id., at 15-16). Mr. Duber advised the Petitioner to take out certain statements, such as his statement that Joey Bowen was not involved, because those

statements would anger the prosecutors. (Id., at 16-17).  Mr. Duber again told the Petitioner to allow his new lawyer to handle those issues. (Id., at 17).  According to Mr. Duber, the letter the Petitioner sent to the Judge was a very toned-down version of the original draft, but the Petitioner "was adamant" about including certain information. (Id., at 16).

After the subsequent trial, and Joey Bowen's acquittal, the Petitioner asked Mr. Duber for help in preparing for his sentencing. (Id., at 17-18).  Mr. Duber testified that he agreed, and assisted Petitioner's new counsel, Mr. Edwards, in preparing exhibits and the Petitioner's testimony for the sentencing hearing. (Id., at 18).  Mr. Duber explained that he lived approximately ten miles form the Petitioner and Mr. Edwards lived some distance away in Cookeville, Tennessee. (Id.).

Mr. Duber testified that he sat through the sentencing hearing, and that he was shocked when the Government presented a revised plea agreement containing the changes to the factual basis suggested by the Petitioner. (Id., at 19).  According to Mr. Duber, the Petitioner had constantly complained during his preparation for sentencing about the Government's refusal to accept his changes to the factual basis, and said he could not understand why the Government wanted him to lie. (Id., at 20).  Mr. Duber testified that if he had seen the revised plea agreement prior to trial, he would have advised the Petitioner to sign it. (Id., at 20-21).

After the sentencing hearing, according to Mr. Duber, he, Joey Bowen, the Petitioner and Mr. Edwards went to the lobby of the hotel where they were staying, and Mr. Edwards asked Mr. Duber if he thought there were any appealable issues. (Id., at 21). Mr. Duber testified that he mentioned the issue of the revised plea agreement. (Id.).  Mr. Duber said that Mr. Edwards said he was not sure there was anything to appeal, but that they all decided to leave and discuss it

more later. (<u>Id.</u>, at 22).

According to Mr. Duber, he later tried to call Mr. Edwards to talk about the Bureau of Prisons substance abuse program and a possible appeal, but could not reach him. (<u>Id.</u>, at 22-23). Mr. Duber testified that he tried to reach Mr. Edwards 12 to 20 times at Mr. Edwards' home phone number and his cell phone number. (<u>Id.</u>, at 23). Mr. Duber testified that he left about five messages with Mr. Edwards stating that he wanted to talk and discuss an appeal. (<u>Id.</u>). Mr. Duber stated that he also asked Joey Bowen to call Mr. Edwards. (<u>Id.</u>). Mr. Duber testified that he does not know if the Petitioner called Mr. Edwards, but that he had encouraged him to do so. (<u>Id.</u>, at 24).

Joey Bowen testified that he is a nephew of the Petitioner, was a co-defendant in the underlying criminal case, and was acquitted of the criminal charge at the trial. (<u>Id.</u>, at 32). Joey Bowen testified that he attended the Petitioner's sentencing hearing, and that he participated in a discussion about a possible appeal. (<u>Id.</u>, at 32-33). According to Joey Bowen, he and others spoke with Mr. Edwards at their hotel after the sentencing hearing, and that they were all stunned at what had happened at the sentencing hearing. (<u>Id.</u>, at 33). Joey Bowen testified that Mr. Edwards told them to think about a possible appeal for a few days, and they would talk later. (<u>Id.</u>). According to Joey Bowen, Mr. Edwards said that they may want to appeal. (<u>Id.</u>).

Joey Bowen explained that later, after speaking with the Petitioner, he tried to call Mr. Edwards. (<u>Id.</u>, at 34). Beginning on the Monday after Thanksgiving, Mr. Duber came by his office and they tried to call Mr. Edwards on three separate occasions. (<u>Id.</u>). Mr. Duber left a message on one of those occasions, and Joey Bowen left a message on another occasion. (<u>Id.</u>, at 34-35). Joey Bowen did not recall if the number they called was for Mr. Edwards' home phone

or cell phone. (Id.). According to Joey Bowen, the message did not direct Mr. Edwards to file an appeal. (Id., at 36).

The Petitioner testified that he first met his first attorney, Joe Baugh, at Mr. Baugh's office in Franklin in 2006, after Mr. Baugh had been appointed to represent him. (Id., at 38). At that time, according to the Petitioner, he had already been cooperating with the Government for three years, and had not yet been indicted. (Id., at 38-39, 73-74). The Petitioner's cooperation included making pre-indictment tape recordings of conversations with a co-defendant, persuading his nephew, Joey Bowen, to meet with investigators, and participating in numerous conversations with investigators. (Sentencing Hearing Transcript, at 60-66 (Docket No. 539 in Case No. 3:06-00109)). The next time he met with Mr. Baugh, the Petitioner testified, was when he pled not guilty to the Indictment, though they spoke on the phone at other times. (Evidentiary Hearing Transcript, at 39 (Docket No. 18)).

At some point thereafter, according to the Petitioner, he received the proposed plea agreement through the mail, and Mr. Baugh told him to read over it and call if he had any questions. (Id., at 40). When they later spoke on the phone, the Petitioner told Mr. Baugh about certain errors in the factual basis section of the plea agreement, and Mr. Baugh told him to mark the changes and fax them to him. (Id., at 40-41). The Petitioner testified that he made revisions to the agreement, which were introduced as Petitioner's Exhibit 3, and sent them to Mr. Baugh. (Id., at 41).

The Petitioner testified that he subsequently spoke with Mr. Duber about the proposed plea agreement and showed him a copy of the revisions he had made. (Id., at 41). Mr. Baugh did not speak with the Petitioner about the changes. (Id.).

The Petitioner testified that the proposed plea agreement was 25 to 30 pages long, and that the three to four pages that made up the factual basis section was the only section of the agreement written in laymen's terms. (Id., at 44).[1]  He said he knew that the proposed agreement included an expected guideline sentencing range of 33 to 41 months of imprisonment, but he thought that range took into account his cooperation. (Id., at 44-45).  When he asked Mr. Baugh about the possibility of getting a deal that included probation, like some of the co-defendants, the Petitioner testified that Mr. Baugh told him they would sit down with the Government and talk about it "when the time is right." (Id., at 49-50, 54, 57, 78, 84).  The Petitioner testified that he did not understand, until Mr. Edwards explained to him later, that under the proposed agreement, his cooperation would be taken into account with a Government motion to reduce his sentence from the 33 to 41 month guideline range. (Id., at 45).

The Petitioner subsequently received a call from Federal Bureau of Investigation ("FBI") Agent Brian Fazenbaker, with whom he had been working over the last three years. (Id., at 42).  Agent Fazenbaker wanted to set up a meeting with the Petitioner at the FBI office in Greenville, North Carolina. (Id.).  The Petitioner testified that Agent Fazenbaker said he had permission to call from Mr. Baugh. (Id.)  The Petitioner then called Mr. Baugh who said he was not aware of the meeting, but would check on it. (Id.)   The Petitioner received a call from Mr. Baugh a few days later, and Mr. Baugh told him that he would not be able to come to the meeting, but that the Petitioner could attend the meeting without him. (Id., at 42).

---

[1]   The Petitioner introduced a version of the proposed plea agreement as Exhibit 4 to the hearing. (Id., at 63).  The proposed plea agreement is 20-pages long, and includes four pages entitled "Factual Basis," and approximately six pages relating to "Offense Level," "Criminal History Category," "Anticipated Sentencing Range," "Cooperation," and "Agreements Relating to Sentencing." (Petitioner's Exhibit 4).

The Petitioner subsequently attended what the parties have characterized as "the proffer meeting" in Greenville. (Id., at 43-44). According to the Petitioner, Assistant United States Attorney ("AUSA") Sam Williamson and AUSA Lori Glenn were at the meeting, and went over the proffer agreement with the Petitioner. (Id., at 44, 46). The Petitioner testified that he would not sign the proffer agreement without speaking with Mr. Baugh. (Id., at 44). Mr. Baugh later spoke with the Petitioner by speaker phone for about ten minutes, and the Petitioner signed the proffer agreement. (Id., at 44, 79-80).

The Petitioner testified that after the proffer meeting, there was a change in tone in the Government's relationship with him. (Id., at 45-46). The Petitioner felt that the AUSAs were upset that he did not want to state that he conspired with a couple of the individuals whose names were included in the proposed plea agreement. (Id., at 46). The Petitioner testified that AUSA Williamson told him that he did not understand the concept of conspiracy. (Id.). After the AUSAs left the meeting, the Petitioner continued meeting with Mr. Fazenbaker and other agents for a day and a half to go over case-related recordings as part of his cooperation. (Id., at 46-47, 53).

The Petitioner testified that he tried to call Mr. Baugh several times after the proffer meeting, but that he was not able to speak with him until ten days to two weeks after the meeting. (Id., at 81).

After the proffer meeting, the Petitioner testified, the Government called and wanted to meet with the Petitioner's stepson and brother-in-law. (Id., at 47). The Petitioner explained that he was very concerned about the request because he believed such a meeting meant that the Government intended to pursue the case against him as these witnesses had no information about

the co-defendants. (Id., at 47-48, 54).

Also after the proffer meeting, the Petitioner learned from Agent Fazenbaker that co-defendant Clarence Shirk had pled guilty and received probation. (Id., at 48-49). The Petitioner asked Mr. Baugh when he would get to discuss his plea deal with the Government, and was told that when the time was right, they would sit down and discuss a deal with the Government. (Id., at 49-50, 54, 57, 78, 84). The Petitioner testified that he was still expecting to receive a revised plea agreement, and that though he was still cooperating, the Government ultimately "quit cooperating with me." (Id., at 59).

The Petitioner then met with Mr. Duber and told him about the proffer meeting. (Id., at 51). The Petitioner testified that Mr. Duber told him he should not have attended the meeting with Government prosecutors without his attorney, and also asked him if he had ever received a target letter. (Id., at 51). According to the Petitioner, he asked Mr. Baugh about whether he should have received a target letter earlier in the investigation. (Id., at 51-52). Mr. Baugh sent the Petitioner some research on target letters. (Id.).

At this point, the Petitioner testified, he was still cooperating and wanted to enter a plea agreement, but was becoming concerned that the plea had not been consummated and that the prosecutors were not pleased with him. (Id., at 52). Consequently, the Petitioner testified that he wrote a letter to the Judge requesting a new attorney. (Id., at 52). According to the Petitioner, his wife typed the letter as he told her what he wanted to say. (Id., at 55). The Petitioner testified that he showed the letter to Mr. Duber, and that he deleted some of the language as a result. (Id., at 55-56). The Petitioner testified that after the hearing in which the Court appointed new counsel, Mr. Baugh told him that either Mr. Baugh or Ms. Glenn had violated their ethics

obligations. (Id., at 85).

The Petitioner testified that he did not see the revised plea agreement incorporating his suggested changes until it was introduced by the Government at the sentencing hearing. (Id., at 51, 58, 60). Given that the revised plea agreement contained the changes to the factual basis he had requested, and given his understanding that his cooperation would effectively reduce the expected sentencing guideline range of 33-41 months contained in the plea agreement, as explained to him by Mr. Edwards, the Petitioner testified that he would have signed the revised plea agreement had he learned of its existence. (Id., at 61-63). He would not have written a letter to the Judge. (Id., at 63-64).

The Petitioner testified that when he first met with Mr. Edwards, he explained his efforts to reach a plea agreement, and at some point, gave Mr. Edwards the revisions he had made. (Id., at 64-65). The Petitioner told Mr. Edwards that he still wanted to reach a plea deal. (Id., at 65). According to the Petitioner, Mr. Edwards subsequently told him that the Government was upset with him for some reason. (Id.). The Petitioner testified that despite their efforts, they could not get the Government to agree to a plea deal that was more favorable than going to trial. (Id., at 66-68). The Petitioner stated that, if it would have benefitted him, he would have preferred to plead guilty without a plea agreement to going to trial, as he had no defense to offer at trial. (Id., at 71).

The Petitioner testified that after the sentencing hearing, he spoke with Mr. Edwards at the hotel where Petitioner was staying about the possibility of appeal. (Id., at 68-69). The Petitioner said that Mr. Edwards told him that there were no real grounds for an appeal, but that the Petitioner should think about it and they would meet about it later. (Id.). The Petitioner testified that he tried to reach Mr. Edwards, and left a message on his cell phone, but was not

able to speak with him. (Id., at 69). In his message, he did not direct Mr. Edwards to file an appeal. (Id., at 97). According to the Petitioner, he thought they should go ahead and file an appeal as they could always drop it later. (Id., at 69-70). The Petitioner did not recall receiving a notice of appeal form from the Court during the sentencing hearing. (Id., at 70).

The Petitioner testified that he liked Mr. Edwards, but never got to know Mr. Baugh. (Id., at 98).

Mr. Baugh testified that he has practiced law since 1974, and worked as an assistant district attorney, then a district attorney, for approximately 20 years. (Id., at 106-07). More recently, Mr. Baugh has worked in private practice representing defendants, and also occasionally serving as a district attorney pro tem. (Id., at 107). Mr. Baugh had handled six to eight federal criminal cases prior to his representation of the Petitioner. (Id., at 127). Based on his timekeeping records, Mr. Baugh indicated that he was appointed to represent the Petitioner on April 3, 2006, when the Petitioner received a target letter prior to issuance of the Indictment. (Id., at 38-39, 109-110). He had a conference with the Petitioner in his office a week after the appointment, during which they discussed the case and the Petitioner's three-year history of cooperation. (Id.). At that time, he did not have any discovery materials or other documents to review with the Petitioner. (Id.) Mr. Baugh testified that the only other time he saw the Petitioner was when he pled not guilty at the arraignment. (Id.)

Mr. Baugh testified that he spoke with AUSAs Glenn and Williamson, as well as Agent Fazenbaker, at some point and thought the case appeared to be going smoothly. (Id., at 110). According to his time records, Mr. Baugh testified, he received a draft plea agreement from the Government some time before September 26, 2006. (Id., at 112). According to Mr. Baugh, he

mailed the plea agreement to the Petitioner, and believes the Petitioner mailed it back to him with revisions made by the Petitioner to the factual basis section. (Id., at 114). Although Mr. Baugh testified that he went over the plea agreement with the Petitioner, he could not recall whether he specifically discussed the "level" the Petitioner was on or the potential sentence he would receive. (Id., at 113, 137-38). Although Mr. Baugh could not recall speaking with the AUSA about the changes the Petitioner made to the agreement, the time records indicate that he called AUSA Glenn on September 28, 2006 to discuss the plea agreement and the changes to the factual basis. (Id., at 114-15).

Mr. Baugh explained that he did not attend the proffer meeting on October 16, 2006 between the Petitioner and the Government agents and prosecutors because the Petitioner had a long history of cooperation with the Government. (Id., at 117-18). He also testified that he thought his presence might make the Petitioner appear less cooperative. (Id., at 131). According to Mr. Baugh, he told the Petitioner he could be reached by telephone if he wanted to talk during the proffer meeting, and at some point during the meeting, they spoke by phone to go over the proffer letter. (Id., at 118-20). Mr. Baugh testified that, in retrospect, he believes he should have attended the proffer meeting. (Id., at 118-19).

According to the time records, Mr. Baugh spoke with AUSA Glenn on October 17, 2006, and Mr. Baugh testified that he recalled learning that the proffer did not go well. (Id., at 120). Mr. Baugh recalled the Petitioner feeling that he had been "bullied" at the proffer meeting, and that the prosecutors were trying to get him to agree to facts with which he disagreed. (Id., at 120-21). Mr. Baugh testified that the Government felt that the Petitioner was "backing up" on the facts to which he had already agreed. (Id.).

On October 20, 2006, the Government faxed a proposed plea agreement to Mr. Baugh, which included the revisions to the factual basis requested by the Petitioner. (Petitioner's Exhibit 4). Mr. Baugh had no specific recollection of receiving the revised plea agreement from the Government, or of sending it to the Petitioner, but believes he would have done so. (Id., at 141-42, 146-48).

Up until the Petitioner wrote a letter to the Court asking for new counsel, Mr. Baugh testified, he believed they were going forward with the guilty plea, and spoke with the prosecutor about scheduling a change of plea hearing. (Id., at 121-26).

The Petitioner's second attorney, Mr. Edwards, testified that he graduated from the University of Toledo College of Law, and then went on to obtain an LLM in international law from the University of Brussels. (Id.) Mr. Edwards then practiced law in Michigan for four years and taught at the Toledo College of Law. (Id.) Since 1994, Mr. Edwards has been practicing law in Tennessee, focused primarily on federal criminal defense. (Id.).

Mr. Edwards testified that he was appointed to succeed Mr. Baugh in representing the Petitioner. (Id., at 150). At the time he took over representation of the Petitioner, Mr. Edwards testified, plea negotiations had come to an end. (Id., at 150-51). Mr. Edwards said he received an e-mail message from AUSA Williamson about the plea agreement and described the Government's position as "very rigid" since the Petitioner had sent the letter to the Judge. (Id., at 160). According to Mr. Edwards, the Government required an enhancement for obstruction of justice to be part of any plea agreement, and any reduction for acceptance of responsibility was not assured. (Id., at 160, 171). Mr. Edwards testified that the Government was upset at the Petitioner because he challenged the factual basis set forth in the plea agreement. (Id., at 161,

170). On the other hand, Mr. Edwards pointed out, the Government used all the Petitioner's cooperation in its prosecution of him and the co-defendants. (<u>Id.</u>). In Mr. Edwards' opinion, it was not the fault of the Petitioner that the cooperative relationship between the Petitioner and the Government had broken down. (<u>Id.</u>, at 162).

During his representation of the Petitioner, Mr. Edwards testified, the Petitioner had shown him the revisions he had made to the proposed plea agreement and was adamant that he could not sign it unless the corrections were made. (<u>Id.</u>, at 157-58). Mr. Edwards testified that when the Government introduced the revised plea agreement at the sentencing hearing, which incorporated the facts as revised by the Petitioner, he was "totally astonished." (<u>Id.</u>, at 157). According to Mr. Edwards, the revised plea agreement was not in the file he had received from Mr. Baugh, and he had never seen the document prior to that time. (<u>Id.</u>,)

Mr. Edwards testified that he could not specifically recall discussing the possibility of pleading guilty without a plea agreement with the Petitioner, but that it is his practice to do so. (<u>Id.</u>, at 151). Given the Government's rigid stance, obtaining a reduction in the offense level of three points for acceptance of responsibility at sentencing was no longer a given even if the Petitioner had entered an "open plea." (<u>Id.</u>, at 160).

Mr. Edwards testified that after the sentencing hearing, he recalls meeting with the Petitioner, Mr. Duber and Joey Bowen in the courthouse cafeteria and discussing the possibility of filing a notice of appeal. (<u>Id.</u>, at 153). According to Mr. Edwards, they concluded that there was nothing to appeal, and that Mr. Edwards should not file a notice of appeal. (<u>Id.</u>). Mr. Edwards recalled that he accompanied the Petitioner to the hotel because he was going to pick up some easels they had used at the sentencing hearing. (<u>Id.</u>). Mr. Edwards testified that he believes

they discussed pursuing their prosecutorial misconduct argument on appeal, and the Petitioner said not to do that. (Id., at 164-65). Mr. Edwards recalls telling the Petitioner that they must file any appeal within ten days. (Id., at 165).

Mr. Edwards testified that he received no further contact from the Petitioner or others regarding the filing of an appeal. (Id., at 153-54). On December 9, 2008, however, Mr. Edwards received an e-mail from Rose Bowen, the Petitioner's wife, thanking him for his efforts and expressing disappointment that the Petitioner was assigned to a prison in West Virginia. (Id., at 155-56; Government's Exhibit 3). Mr. Edwards testified that Mrs. Bowen did not mention an appeal. (Id.)

## III. Analysis

### A. The Petitioner's Claims

Through his Motion To Vacate, Petitioner contends that he received the ineffective assistance of counsel because Mr. Baugh failed to convey a plea offer made to him by the Government prior to trial. Petitioner also argues that Mr. Edwards failed to advise him of his option to plead guilty without a plea agreement, and failed to comply with his request to file an appeal.

### B. Section 2255 Remedy

Section 2255 provides federal prisoners with a statutory mechanism by which to seek to have their sentence vacated, set aside or corrected.[2] The statute does not provide a remedy,

---

[2] 28 U.S.C. § 2255 states, in part:

> A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws

however, for every error that may have been made in the proceedings leading to conviction. The statute contemplates constitutional errors, and violations of federal law when the error qualifies as a "fundamental defect which inherently results in a complete miscarriage of justice." Reed v. Faley, 512 U.S. 339, 114 S.Ct. 2291, 2296, 2299-2300, 129 L.Ed.2d 277 (1994); Grant v. United States, 72 F.3d 503, 505-06 (6th Cir. 1996).

Rule 4(b) of the Rules Governing Section 2255 Proceedings provides that the Court shall consider the "files, records, transcripts, and correspondence relating to the judgment under attack" in ruling on a petition or motion filed under Section 2255. In addition, where the same judge considering the Section 2255 motion also conducted the trial, he may rely on his recollections of the underlying criminal proceedings. Blanton v. United States, 94 F.3d 227, 235 (6th Cir. 1996).

C.  Ineffective Assistance of Counsel

In order to prevail on an ineffective assistance of counsel claim, the burden is on the Petitioner to show:  (1) trial counsel's performance was not within the range of competence demanded of attorneys in criminal cases; and (2) actual prejudice resulted from the deficient performance.  Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984); O'Hara v. Wigginton, 24 F.3d 823, 828 (6th Cir. 1994).

Counsel has rendered deficient performance when he or she "made errors so serious that

---

of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.

counsel was not functioning as the 'counsel guaranteed' by the Sixth Amendment." <u>Strickland</u>, 466 U.S. at 687; <u>Cooper v. Lafler</u>, 2010 WL 1851348, at *5 (6th Cir. May 11, 2010). In analyzing trial counsel's performance, the court must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," and consider "whether counsel's assistance was reasonable considering all the circumstances." <u>Strickland</u>, 466 U.S. at 688-89.

In showing that he was prejudiced, the petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." <u>Id.</u>, at 694. The petitioner "need not show 'that counsel's deficient conduct more likely than not altered the outcome in the case.'" <u>Cooper</u>, at *5 (quoting <u>Strickland</u>, 466 U.S. at 693).

As the Sixth Circuit has explained, the <u>Strickland</u> framework for evaluating an ineffective assistance of counsel claim applies to advice regarding whether to plead guilty. <u>Cooper</u>, at *6; <u>Padilla v. Kentucky</u>, ___ U.S. ___, 130 S.Ct. 1473, 176 L.Ed.2d 284 (2010)(". . . we have long recognized that the negotiation of a plea bargain is a critical phase of litigation for purposes of the Sixth Amendment right to effective assistance of counsel). The prejudice component focuses on whether counsel's deficiency affected the outcome of the plea process. <u>Id.</u> Where the petitioner rejects a plea offer, he must show a "'*reasonable probability* that, but for his counsel's erroneous advice. . . he would have accepted the state's plea offer.'" <u>Id.</u> (quoting <u>Magana v. Hofbauer</u>, 263 F.3d 542, 551 (6th Cir. 2001)). <u>See</u> <u>also</u> <u>Griffin v. United States</u>, 330 F.3d 733, 737 (6th Cir. 2003).

Failure to convey the terms of a plea offer has been held to constitute ineffective

assistance of counsel.  Smith v. United States, 348 F.3d 545, 552-53 (6th Cir. 2003); Griffin v. United States, 330 F.3d at 737.  In addition to conveying the plea offer, counsel is expected to "review the charges with [the defendant] by explaining the elements necessary for the government to secure a conviction, discuss the evidence as it bears on those elements, and explain the sentencing exposure the defendant will face as a consequence of exercising each of the options available." Smith, 348 F.3d at 553.  "In a system dominated by sentencing guidelines, we do not see how sentence exposure can be fully explained without completely exploring the ranges of penalties under likely guideline scoring scenarios, given the information available to the defendant and his lawyer at the time." Id.

The Sixth Circuit has held, however, that the decision to plead guilty "first, last, and always – rests with the defendant, not his lawyer." Smith, 348 F.3d at 552.  See also Purdy v. United States, 208 F.3d 41, 45 (2nd Cir. 2000)(Counsel must not coerce a client into either accepting or rejecting a plea offer.)

Based on the evidence adduced at the hearing, and the entire record of this case and the underlying criminal case, the Court concludes that the Petitioner received the ineffective assistance of counsel in regard to plea negotiations during Mr. Baugh's representation.  First, the Court finds that Mr. Baugh did not fully explain to the Petitioner the potential sentence and the sentencing options offered by the initial proposed plea agreement (and repeated in the revised plea agreement).  Although Mr. Baugh sent the first draft of the proposed agreement to the Petitioner for his review, there is no evidence in the record that he ever fully explained the terms of the 20-page document to the Petitioner, especially the sections of the agreement relating to a

reduction in the 33 to 41 month sentencing range for Petitioner's cooperation.[3]  Petitioner

testified that he did not understand, until Mr. Edwards explained to him (after the offer had been

withdrawn), that the 33 to 41 month sentencing range set forth in the proposed plea agreement

was an estimate made prior to any Government motion for a reduction in the sentence based on

substantial assistance.  Consequently, the Petitioner viewed his "plea deal" as one for 33 to 41

months, less favorable than the deals being offered to the co-defendants who had not provided

the same level of cooperation and assistance to the Government that he had provided.  The

language of the proposed plea agreement regarding sentencing is complex and an attorney who

leaves it up to his client to read and understand that language without assistance is not providing

effective representation.

       Second, the Court finds that Mr. Baugh did not convey to the Petitioner that the

Government had agreed to the factual revisions he had requested to the first draft of the proposed

plea agreement.  Although Mr. Baugh testified at the hearing that he assumes he told the

Petitioner of the Government's position, he did not specifically recall doing so.  On the other

hand, the Petitioner testified that he was not aware that the Government had accepted the

revisions.  The Petitioner's testimony is supported by that of Mr. Duber and Mr. Edwards, who

both testified that the Petitioner repeatedly complained about the Government's failure to accept

his changes.  Mr. Duber and Mr. Edwards also testified that they were all stunned when the

revised plea agreement was produced at the sentencing hearing.  Furthermore, Mr. Edwards

---

       [3]   The Government's argument to the contrary is based on a couple of notations in Mr.
Baugh's time records reflecting a telephone call with the Petitioner "re: plea agreement."
(Government's Exhibit 2). These notations simply do not support the conclusion that Mr. Baugh
fully explained the proposed plea agreement to the Petitioner, especially in light of the direct
testimony of the Petitioner and the other witnesses to the contrary.

testified that when he received the case file from Mr. Baugh, it did not contain a proposed plea agreement with the changes suggested by the Petitioner.[4]

Based on these failures by Mr. Baugh, the Petitioner was laboring under the mistaken belief that the Government was offering him a plea agreement in which he would be serving a 33 to 41 month sentence, and would be required to testify to facts with which he did not agree. The actual plea offer, on the other hand, would have involved a lower sentence, and would have only included the facts agreed to by the Petitioner. The evidence is uncontroverted that the Petitioner would have accepted the actual plea offer had it been conveyed to him.

Counsel's error in failing to convey and explain the actual plea offer to the Petitioner was compounded by his failure to attend the proffer session with the Government prosecutors. The Government contends that nothing happened at the proffer session that should have been of concern to the Petitioner, but it did not call the prosecutors who led the proffer session to testify at the hearing.[5] On the other hand, the Petitioner was clearly concerned about the interaction with prosecutors at the proffer session, and the testimony of Mr. Duber, Mr. Baugh and Mr. Edwards supports that conclusion. That concern, coupled with the Petitioner's misunderstanding

---

[4]   The Government's argument that Mr. Baugh sent the revised plea agreement to the Petitioner is based on what Mr. Baugh testified was his normal practice, and on certain three-to-four word time record notations indicating that Mr. Baugh was working on setting the guilty plea hearing and finalizing the plea process. (Government's Exhibit 2). Mr. Baugh's time records are abbreviated, however, and do not state that Mr. Baugh sent the revised plea agreement to the Petitioner. The evidence cited by the Government does not support a finding that Mr. Baugh actually conveyed the revised plea agreement to the Petitioner in the face of the direct testimony of the Petitioner and the other witnesses to the contrary.

[5]   Although the Government cites certain factual statements made by the prosecutors in briefs filed in the underlying criminal case (Docket No. 501 in Case No. 3:06-00109), those statements do not carry the same evidentiary value as testimony given under oath and subject to cross examination.

about the Government's actual plea offer led the Petitioner to write the letter to the Court two months later requesting new counsel. It is that letter that the Government contends destroyed their ability to use the Petitioner as a witness, and led them to withdraw the prior plea offer and seek an enhancement for obstruction of justice.

The prejudice in this case is clear. Petitioner clearly intended to plead guilty and would have done so had he been advised of the actual plea offer. The Petitioner testified to that effect, and the testimony of both Mr. Baugh and Mr. Edwards indicates that the Petitioner had always desired and intended to plead guilty. Petitioner's course of conduct also supports a finding that he intended to plead guilty. Petitioner cooperated and actively assisted in the investigation for three years, providing information that was instrumental in obtaining the convictions of the co-defendants. Agent Fazenbaker testified at the sentencing hearing that he had never seen a defendant cooperate with the Government for three years, and then end up going to trial. (Sentencing Hearing Transcript, at 31 (Docket No. 539 in Case No. 3:06-00109)).

The disparity between Petitioner's sentencing exposure of 60 months and the sentence under the actual plea offer of less than 33 months also supports Petitioner's prejudice argument. See Cooper, at *8; Smith, 348 F.3d at 552. (Collecting cases for the proposition that the disparity between the plea offer and the potential sentence exposure is strong evidence of a reasonable probability that a properly advised defendant would have accepted a guilty plea offer); United States v. Allen, 53 Fed. Appx. 367, 376, 2002 WL 31890920 (6th Cir. Dec. 26, 2002)(Difference of 51 to 63 months with plea offer and 70 to 87 months without plea offer establishes prejudice).

Thus, the Court concludes that the Petitioner has established both deficiency by Mr. Baugh for failure to convey and explain the Government's actual plea offer to the Petitioner, and

prejudice resulting from that deficiency.

In devising a remedy for counsel's failure to convey a plea offer, the courts have sought to restore a petitioner to the position he would have been in had the deprivation of the right to counsel not occurred:

> We also noted [in <u>Turner v. Tennessee</u>, 858 F.2d 1201, 1205 (6th Cir. 1988), *vacated on other grounds*, 492 U.S. 902, 109 S.Ct. 3208, 106 L.Ed.2d 559 (1989), *reinstated on other grounds*, 940 F.2d 1000, 1002 (6th Cir. 1991)] that because the remedy for a Sixth Amendment violation should 'neutralize' the constitutional deprivation suffered by the defendant, a new trial was an inappropriate remedy for a defendant who had constitutionally deficient counsel during the plea negotiation process. <u>Id,</u> at 1208. Instead, we held that, as a remedy, the prosecution was free to offer the defendant another plea bargain, but that any plea offer in excess of the original offer must overcome a rebuttable presumption of prosecutorial vindictiveness. <u>See</u> <u>id.</u> at 1209.

<u>Magana,</u> 263 F.3d at 553). <u>See</u> <u>also</u> <u>Cooper,</u> at *10 (District court's remedy of a conditional writ which gave the state the opportunity to offer a plea deal or release the petitioner was appropriate); <u>United States v. Allen</u>, 53 Fed. Appx. at 373-74.

As the parties have not specifically addressed the issue of remedy, they are directed to file briefs, on or before July 21, 2010, addressing the appropriate remedy for the constitutional deprivation found by the Court herein.

In light of the Court's determination that the Petitioner received ineffective assistance of counsel with regard to Mr. Baugh's failure to convey and explain the Government's actual plea offer, it is unnecessary to consider Petitioner's claims regarding Mr. Edwards.


IV. <u>Conclusion</u>

For the reasons set forth herein, the Court concludes that Petitioner's Motion filed under

28 U.S.C. § 2255 should be granted as set forth above.

It is so ORDERED.

TODD J. CAMPBELL
UNITED STATES DISTRICT JUDGE